## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| PARKER PELHAM, Individually and on Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>     v.<br><br>VBIT TECHNOLOGIES CORP., VBIT MINING LLC, ADVANCED MINING GROUP, DANH CONG VO a/k/a DON VO, PHUONG D VO a/k/a KATIE VO, SEAN TU, JIN GAO, LILLIAN ZHAO, and JOHN DOE INDIVIDUALS 1-10, and DOE COMPANIES 1-10,<br><br>                                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Parker Pelham ("Plaintiff"), individually and on behalf of all others similarly situated, by his undersigned attorneys, alleges the following against Defendants VBit Technologies Corp., VBit Mining LLC, Advanced Mining Group (collectively, the "Company Defendants"), Danh Cong Vo a/k/a Don Vo, Phuong D Vo a/k/a Katie Vo, Sean Tu, Jin Gao, and Lillian Zhao (collectively, the "Individual Defendants"). The Company Defendants and the Individual Defendants together are referred to as "Defendants." Plaintiff's allegations herein are based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases, media reports, and other publicly disclosed reports and information about Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after additional opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a class action on behalf of all investors who purchased unregistered securities in the form of investment contracts promising the sales, leasing, and servicing of specialized computer hardware to produce Bitcoins for customers (the "VBit Mining Contracts" or "Mining Contracts").  These investment contracts were securities that were not properly registered with the U.S. Securities and Exchange Commission ("SEC") or state regulators.  To make matters worse, rather than using the proceeds from the unregistered securities to truly mine Bitcoin and pay it out to Plaintiff and Class members, Defendants instead operated a massive Ponzi scheme that paid out the promised Bitcoin as new Class members and victims bought in.

2.      Bitcoin mining is a process that requires powerful computers and significant electrical power.  As compensation for performing the resource-intensive computing "proof of work" necessary to verify the transactions on Bitcoin's blockchain, Bitcoin "miners" receive block rewards in the form of Bitcoin.

3.      By design, only 21 million Bitcoins will ever be created, and more than 19 million Bitcoins have already been mined.  This limited supply drives a fear of missing out on a lucrative business opportunity.  Moreover, approximately every four years, the block reward is cut in half, meaning that successful miners receive half of the amount of Bitcoin.

4.      The Bitcoin price is volatile because it is highly susceptible to fluctuating demand, changing global regulations, and social media hype.  Since its inception, Bitcoin has seen a meteoric rise in value.  Bitcoin traded at $0.09 per Bitcoin in 2010 and reached a high of approximately $69,000 in November 2021.  Since then, the price of one Bitcoin has ranged from its high of $69,000 in November of 2021 to approximately $22,000 as of the filing of this Complaint.

5.      In Bitcoin's infancy, a standard individual computer could successfully mine Bitcoin.  Now, the computing power necessary to mine has expanded greatly as the verification process has evolved.  Today, most Bitcoin mining takes place in large facilities that store and power vast sets of computers containing application specific integrated circuits, or ASICS, that do the mining.

6.      As Bitcoin mining has been highly profitable for some companies and individuals, Defendants used it as a vehicle to prey on cryptocurrency consumers and sell unregistered securities.  As alleged herein, Defendants Danh Cong Vo, Phuong D Vo, Sean Tu, Jin Gao, VBit Tech, VBit Mining, and Advanced Mining entered into a scheme to recruit Plaintiff and the members of the Class (defined *infra*, ¶130) to enter into investment contracts to purchase Bitcoin mining packages that Defendants promised would enable Plaintiff to mine Bitcoin.  In soliciting the unregistered securities to Plaintiff and the Class, Defendants made fraudulent statements and promotions about the returns that investors would receive and the true use of the proceeds of the sale.

7.      As set forth in the attached certification, Plaintiff entered into investment contract agreements with Defendants VBit Tech, VBit Mining, and Advanced Mining whereby Defendants would purportedly host physical Bitcoin mining equipment at facilities it owned, which in turn would allow Plaintiff to mine and procure Bitcoin.  Plaintiff invested U.S. dollars and Bitcoin with Defendants in exchange for Defendants' purported equipment and "hosting" services.  Defendants raised millions of dollars through the sale of these unregistered securities in violation of the registration provisions of the federal securities laws, thereby funding the Company Defendants' operation and enriching the Individual Defendants.

8.      In or about June 2022, Plaintiff discovered that he was unable to make withdrawals of Bitcoin from his "virtual wallet," which was located in an online dashboard hosted by Defendants.  While Defendants blamed the delays on technical issues, it soon became apparent that something was seriously wrong.  Plaintiff's purported wallet was frozen and completely prevented Plaintiff from accessing the valuable Bitcoin that he supposedly held.  Plaintiff was also unable to access the computer hardware that he purportedly owned or was leasing.

9.      In reality, Plaintiff's individual wallet appears to have been a façade as Defendants were not offering and maintaining individualized, hardware-hosted mining services to Plaintiff as represented.  Instead, Defendants were engaged in "cloud mining," or a similar arrangement whereby customers' computing power – dubbed a "hash rate" – is pooled together and wholly unrelated to the physical products and service they are purportedly being sold.

10.      Plaintiff and Class members were promised individualized, specialized, cutting edge computer technology touted by Defendants as being capable of producing hefty returns. Plaintiff never received the individualized mining equipment and services that he paid for; rather, Plaintiff's investments were pooled together with investments from other customers.  The Bitcoins appearing in Plaintiff's "virtual wallet" were mere investment returns arbitrarily determined by Defendants.

11.      Defendants' activities have all the markings of a Ponzi scheme cloaked in technological sophistication.  Moreover, the scheme has all the markings of a pyramid scheme as it was fueled with multi-level marketing, as customers were encouraged to recruit family, friends, and colleagues to become victims in exchange for purported rewards.

12.      The contractual agreements at issue and the products and services sold thereunder, *i.e.*, Defendants' "hosting services" and "mining equipment," constitute investment contracts and

securities under §3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. §78c, because they are investments in common ventures premised on a reasonable expectation of profits to be derived primarily from the entrepreneurial or managerial efforts of others.  Further, the Mining Contracts were securities under the test set forth in *Reves v. Ernst & Young*, 494 U.S. 56, 64-66 (1990), and its progeny.  The Mining Contracts also have all the traditional hallmarks of a security, as reflected in *SEC v. W.J. Howey Co*., 328 U.S. 293 (1946), and subsequent case law.

13.    Federal securities laws require any security that is offered or sold to be registered with the SEC.  The Mining Contracts were not registered with the SEC or any other securities regulatory authority.  The failure to register the Mining Contracts subjected investors to significant risks.  The securities laws are designed to protect the public by requiring various disclosures so that investors can better understand the security that is being offered or sold, as well as risks associated with investment in that security.  Absent the disclosures required by law about those efforts and the progress and prospects of the enterprise, significant informational asymmetries may exist between the management and promoters of the enterprise on the one hand, and investors and prospective investors on the other hand.  The reduction of these information asymmetries through required disclosures protects investors and is one of the primary purposes of the securities laws.

14.    Defendants have sold unregistered securities in violation of the Securities Act of 1933 ("Securities Act").  Moreover, Defendants have engaged in securities fraud in violation of the Securities Exchange Act of 1934 ("Exchange Act").  Further, the Individual Defendants are all culpable participants in Defendants' fraudulent scheme, committing acts of misfeasance such that the Individual Defendants should be held personally liable for the misconduct of the Company Defendants.  Plaintiff, by this action, seeks rescission of the investment contracts he entered into with Defendants as well as for damages suffered due to the fraudulent conduct complained of

herein.  Defendants' inability to honor investor withdrawals underscores investors' reliance on the efforts of Defendants to provide the expected profits.  Ultimately, Defendants' efforts fell short, and it is Plaintiff and the Class that bore the cost of that failure.

## THE PARTIES

*Plaintiff*

15.     Plaintiff Parker Pelham is a citizen of the State of North Carolina and resides in Wilmington, North Carolina.  As set forth in the attached certification, Plaintiff purchased unregistered securities in the form of investment contracts from Defendants during the Class Period and suffered investment losses as a result of Defendants' conduct.

*Defendants*

16.     Defendant VBit Technologies Corp. ("VBit Tech") is a Delaware corporation with its principal place of business located at 1625 Washington Avenue, Philadelphia, Pennsylvania 19146.

17.     Defendant VBit Mining LLC ("VBit Mining") is a Delaware limited liability company with its principal place of business located at 1625 Washington Avenue, Philadelphia, Pennsylvania 19146.  According to Defendants, VBit Mining is a direct subsidiary of VBit Tech.

18.     According to Defendants, Defendant Advanced Mining Group ("Advanced Mining") is an "Asian-based," foreign entity whose activities either are located at 1625 Washington Avenue, Philadelphia, Pennsylvania 19146, and/or who operates as the alter ego or instrumentality of VBit Tech, VBit Mining, and/or the Individual Defendants.

19.     Defendant Dahn Cong Vo a/k/a Don Vo was the Chief Executive Officer ("CEO") of VBit Tech and VBit Mining until in or around January 2022.  Mr. Vo resides at 1823 S. Dover Street, Philadelphia, Pennsylvania 19145.  Mr. Vo exercised control over the Company Defendants

and directed and/or authorized, directly or indirectly, the sale and solicitation of Mining Contract investments to the public.

20.     Defendant Phuong D Vo a/k/a Katie Vo is an executive who was touted as an integral part of VBit's formation and development.  Ms. Vo is married to Mr. Vo and resides at 1823 S. Dover Street, Philadelphia, Pennsylvania 19145.  Ms. Vo exercised control over the Company Defendants and directed and/or authorized, directly or indirectly, the sale and solicitation of Mining Contract investments to the public.

21.     Defendant Sean Tu is the former Chief Technology Officer of VBit Tech and VBit Mining and the present Chief Operating Officer of Advanced Mining.  Tu resides at 1390 Braun Court, Eagan, Minnesota 55123.  Tu exercised control over the Company Defendants and directed and/or authorized, directly or indirectly, the sale and solicitation of Mining Contract investments to the public.

22.     Defendant Jin Gao holds himself out as the Vice Chairman of Advanced Mining and previously held the position of Vice President of VBit.  Gao resides at 3213 Riseview Walk, #101, in Philadelphia, Pennsylvania 19125.  Gao exercised control over the Company Defendants and directed and/or authorized, directly or indirectly, the sale and solicitation of Mining Contract investments to the public.

23.     Defendant Lillian Zhao is the current CEO of Advanced Mining.  Zhao resides in Philadelphia, Pennsylvania.  Zhao exercised control over the Company Defendants and directed and/or authorized, directly or indirectly, the sale and solicitation of Mining Contract investments to the public.

## JURISDICTION AND VENUE

24.     This Complaint is filed, and these proceedings are instituted, to recover damages and obtain other relief that Plaintiff has sustained due to Defendants' unregistered and unqualified offers and sales of securities in violation of §§5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§77e, 77l, and 77o.  The claims asserted herein also arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b).

25.     This Court has subject-matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. §78aa and 28 U.S.C. §1331 and pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

26.     Venue is proper in the United States District Court for the District of Delaware because the underlying investment contracts entered into by the parties require that venue shall be located in this District.

27.     In connection with the acts alleged by this Complaint, Defendants used interstate commerce to advance their fraudulent scheme.

## SUBSTANTIVE ALLEGATIONS

28.     A crypto-asset is a digital asset designed to work as a medium of exchange or a store of value or both.  Crypto-assets leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

29.     Created in 2009, Bitcoin was the world's first decentralized crypto-asset.  With a current market capitalization of approximately $418 billion, Bitcoin is also the largest and most popular crypto-asset.

30.     One of the main features that Bitcoin popularized was the use of a distributed ledger to track the ownership and transfer of every Bitcoin in existence.  This distributed ledger is known as a blockchain.  Blockchains are a central technical commonality across most crypto-assets.

31.     There are two main ways to obtain Bitcoin.  One way is to purchase Bitcoin from an exchange.  The other way is to participate in the framework of incentives to validate the transactions on the blockchain, dubbed the "Proof of Work" mechanism.  Users who expend resources to validate the blockchain get rewarded with newly minted Bitcoin.  This process is colloquially referred to as "mining" for Proof of Work blockchains like Bitcoin.  The measure of computing power that determines how quickly a computer can mine Bitcoin is dubbed the "hashrate."

32.     Defendant Danh Vo started VBit Tech and VBit Mining (collectively, "VBit") in 2018 and lured retail customers with promises that they could mine Bitcoin like large institutional miners who run entire facilities dedicated to Bitcoin mining and operate where electricity is inexpensive.

33.     Defendant Danh Vo distinguished VBit with the claim he could give retail investors the ability to participate in the infrastructure of the cryptocurrency industry without all the risk associated with investing directly in the volatile cryptocurrency itself like Bitcoin.

34.     VBit offered two primary products and services: (a) computer hardware, or "hashboards" specialized for Bitcoin mining, and (b) so-called "hosting" services, which would enable customers to mine Bitcoin remotely with little or no effort or technical expertise.

35.     VBit advertised on its website, "[y]ou don't need to do anything regarding the setup or maintenance of your hardware.  We take care of logistics, installing and updating software, providing affordable electricity, [and] keeping your equipment cool and in working order."[1]

36.     Through misleading marketing and advertising, VBit falsely represented to Plaintiff and the Class that it "operate[s] some of the largest and most efficient mining facilities in the world, with unprecedented access to clean, cheap power and expert staff."[2]

37.     Thus, VBit falsely represented that it would host its customers' individualized computer hardware in its data centers and that its customers would control the extent of their participation in the mining of Bitcoin, and in exchange the customers would be responsible for "hosting" costs.

38.     VBit sold several mining packages, some of which included a set period of hosting with the upfront price of the package, while others required a down payment followed by monthly hosting charges.

39.     Although VBit's ownership and operational structure was hidden, upon information and belief, Mr. Vo co-founded VBit with Defendant Gao and was VBit's CEO from its founding in 2018 through January 2022.

40.     Advanced Mining, which now purportedly owns VBit, similarly represents on its website that it can provide customers the opportunity to purchase their personal Bitcoin mining

---

[1]     *See Mining Shop*, VBIT MINING, https://web.archive.org/web/20210919232007/ https://www.vbitmining.com/mining-shop/ (Sept. 19, 2021).

[2]     *See Here's How VBIT Mining Works*, VBIT MINING, https://web.archive.org/web/ 20211224100044/https://www.vbitmining.com/ (Dec. 24, 2021).

equipment with "custom designed data centers," the "cheapest electricity rates," and "efficient mining systems."[3]

41.     Advanced Mining's website further advertises that Bitcoin mining previously required "a huge amount of know-how, but now anyone can leverage [Advanced Mining's] experts' skills relieving you of setup and maintenance, so you can focus on the more important things to ensure a profitable operation."[4]  Advanced Mining advertises that it is "Highly Proven & Trusted.  Built by technology and financial experts, our US-based operations are designed for clients who seek a reliable partner.  Our customer support is staffed by proven mining specialists.  Any questions or concerns?  Just call or write!"[5]

42.     Defendant Tu was VBit's Chief Technology Officer, and presently serves as the Chief Operating Officer of Advanced Mining.  According to Mr. Tu's LinkedIn profile, Mr. Tu sought to provide VBit customers with "the technology, infrastructure, services and support that enables them to be successful miners and achieve their financial goals."[6]

43.     Upon information and belief, Defendant Gao is a co-founder of VBit, once held the title Vice President of VBit, and presently serves as Advanced Mining's "Vice Chairman."

44.     Defendant Gao had an active role in promoting VBit.

45.     Defendant Phuong Vo is credited with inspiring Mr. Danh Vo to launch VBit.  She was a leader in the organization, and in a speech given at a 2019 gala to celebrate VBit's first year, referred to VBit as her "child."

---

[3]     *See Why Advanced Mining?*, ADVANCED MINING, https://www.advancedmining.io/how-mining-works/ (last visited Feb. 13, 2023).

[4]     *Id.*

[5]     *Id.*

[6]     Sean Tu, LINKEDIN, https://www.linkedin.com/in/sean-t-8200935/ (last visited Feb. 13, 2023).

46.     Plaintiff and Class members entered into the Mining Contract investments with VBit and Advanced Mining.  The Contracts were drafted by Defendants, and were uniform and consistent as to Plaintiff and all other Class members.

47.     Defendants also made promises about the nature of the products and services provided by the Contract on their website's Frequently Asked Questions ("FAQ") section and made other public misrepresentations concerning VBit and investors' prospects.

48.     Defendants offered and sold different investment contracts under the guise of mining packages ranging from "Silver" on the low end to "Black Diamond" on the high end.

49.     As set forth in the contemporaneously filed certification, Plaintiff made a number of investments in the VBit unregistered securities.

50.     Beginning in January 2020 and continuing through to June 2022, Plaintiff purchased unregistered securities by entering into investment contracts with VBit and Advanced Mining.  As set forth in the attached certification, Plaintiff purchased a Gold Hosting Packages and Black Diamond Hosting Packages and renewal subscriptions.

51.     Pursuant to the Mining Contracts, VBit and Advanced Mining represented that they would be utilizing individualized mining equipment for the benefit of Plaintiff and the Class. Further, the FAQ on Defendants' website emphasizes the physical and customer-specific nature of the hardware being purchased.

52.     Under the Contract, Plaintiff leased Bitcoin mining equipment from VBit/Advanced Mining, but also had the option to purchase the equipment for $1, plus shipping and handling fees.  Defendants had total control over Plaintiff's equipment.  Defendants promised to host the equipment purchased by Plaintiff and Class members.

12

53.     The website FAQ explains that "our hosting services include regular maintenance and cleaning by dedicated staff at our data centers."[7]  The website FAQ also encourages customers to utilize the hosting services by explaining the economies of scale related to operating such Bitcoin mining hardware.  The website FAQ is also where Defendants explain how customers should have been able to account for the Bitcoins that were supposedly being mined on their leased or purchased hardware hosted by the Defendants.  Further, the website FAQ explained how customers would be able to access the Bitcoins that were supposedly being mined on their equipment.

54.     Through its marketing efforts, VBit was able to grow its user base to approximately 15,000 customers worldwide as of June 2022.

55.     VBit achieved this rapid growth through pyramid scheme-style tactics.  By using multi-level marketing, VBit turned its customers into a sales force, and incentivized them to recruit new VBit customers.

56.     VBit recruited customers to promote its products by using word of mouth and to simplify the complexities of Bitcoin mining.  VBit referred to its customer recruiters as "affiliates."

57.     Some affiliates and VBit employees hosted Zoom sessions where they touted the virtues of VBit and shared stories of their own success with VBit.  VBit advertised that one could become an affiliate and earn commissions even if she or he were not currently a VBit customer.

---

[7]     *Frequently Asked Questions – Hardware and Hosting: What happens if my machine fails?*, ADVANCED MINING, https://www.advancedmining.io/faqs/ (last visited Feb. 13, 2023).

58.     VBit employees posted videos on YouTube and social media about how to recruit affiliates to increase the hardware and computing power available to customers to increase their mining payouts.[8]

59.     When VBit affiliates recruited new VBit customers "under them," the recruiting affiliate received a referral commission in cash or Bitcoin and, according to Defendants, could receive a "boosted hashrate" on his own machines.  This recruitment structure is consistent with multi-level marketing pyramid schemes.

60.     The "boosted hashrate" purportedly would increase a customer's mining power. Thus, allowing the customer to mine Bitcoin faster than they had prior to the referral commission.

61.     VBit employees, executives, and affiliates, including Defendant Gao, National Leader Skip McCoy, and Business Partner Gersham Fulcott posted videos online as a means of recruiting VBit customers.

62.     Additionally, Defendants told VBit customers they could receive large bonuses for reaching a certain affiliate rank when they hit certain customer recruitment benchmarks.

63.     For example, Defendants Danh Vo and Gao presented supposed top performers with new BMW sports cars and shared videos of the presentation.

64.     An October 3, 2020 YouTube video posted by Mr. Fulcott explains all the various types of compensation that VBit customers were told they could earn by recruiting friends, family, and colleagues to become VBit customers.[9]

65.     Customers were also told they would earn cash commissions based on the price the recruited customer paid for a mining package.  VBit customers that sold mining packages to their

---

[8]     *See*, *e.g.*, VBit Tech Team PH, *VBit Tech Team PH – Compensation Plan*, YOUTUBE (Oct. 3, 2020), https://www.youtube.com/watch?v=BPPCT_KkjUs.

[9]     *See id.*

own contacts were told they would receive a cash commission of 6% from sales to their direct recruits and commissions ranging from 0.75%–4.5% for sales made by recruits further down the chain, up to six levels down.

66.    In addition to cash bonuses tied to the amount of a sale, Defendants told VBit customers who sold mining packages to their own contacts that they would receive 10% of that package's hashrate as a bonus on top of that customer's existing hashrate.

67.    Mr. Fulcott represented that, "[i]f you personally (level 1) sold a package that has 10,000 GH/s, you will receive 1,000GH/s to your mining account and make more Bitcoin everyday!"[10]

68.    Just like the cash bonuses, Defendants told customers they could also receive hashrate bonuses not only for those customers who they personally recruited, but also from customers up to "seven levels" down the chain of recruitment.

69.    In keeping with Defendants' Ponzi scheme, the result of these hashrate bonuses was that every time a VBit affiliate customer recruited another customer, VBit would sell the new customer its contracted package and would also provide the recruiting affiliates up the sales chain with additional hashrate computing power for one year.

70.    According to the slide in Mr. Fulcott's presentation, if an affiliate customer with "Vice Chairman" status recruited a new customer, VBit represented it would give seven levels of affiliate customers hashrate bonuses tied to that new purchase.

71.    The result was that VBit promised to deliver a total of 30% in hashrate bonuses for sales of mining packages made under an affiliate that was a Vice Chairman.

---

[10]    *See id.* at 11:36.

72.     For example, if a new customer purchased a package with a hashrate of 100,000 giga hashes per second ("GH/s") and there was a sufficient network of "affiliates" with a Vice Chairman at the top of the top of the web of affiliates, VBit would then promise to deliver an additional 30,000 GH/s in hashrate power to the affiliates above the new customer.

73.     VBit also offered an incentive program called the "Infinity Team," which provided recruitment incentives based on a customer's total sales volume from all customers that he or she recruited or that were recruited under him.

74.     The "Infinity Team" cash bonuses started at $100 for $5,000 in sales.

75.     According to Defendants, once a VBit affiliate brought in $500,000 in sales volume he or she would receive $5,000 to use on a shopping spree (or $2,000 worth of Bitcoin).

76.     The stated purpose of providing shopping money was to encourage affiliates to buy luxury clothes that would serve as conversation starters and encourage friends and family to ask how the affiliate could afford a new watch or designer shoes.

77.     Defendants represented that once an affiliate brought in $1,000,000 in sales, VBit would pay for the affiliate to go on a luxury vacation valued at $10,000.  Defendants represented that once an affiliate brought in $3,000,000 in sales, VBit would pay for the affiliate to receive a new BMW (or $20,000 in Bitcoin).  Defendants further represented that, once an affiliate brought in $30,000,000 in sales, VBit would pay for the affiliate to receive a "motor vehicle," which is described as "anything with an engine" (including a boat or plane), worth up to $350,000 (or $150,000 in Bitcoin).  Defendants represented that once an affiliate brought in $200,000,000 in sales, VBit would buy the affiliate a new house worth up to $1.5 million, plus $100,000 in Bitcoin.

78.     In forming VBit, Defendant Danh Vo specifically targeted consumers who were not tech savvy, but who wanted to cash in on the excitement surrounding Bitcoin.

79.     One such consumer was Mayama Kesselly who learned about VBit from a coworker who pitched her on purchasing VBit services.[11]

80.     Ms. Kesselly took out $50,000 in loans to make her purchase and, similar to Plaintiff, purchased the "Black Diamond" mining package.

81.     Ms. Kesselly soon became a VBit "evangelist" and recruited her friends to also purchase VBit mining packages, and Ms. Kesselly spent her returns on additional packages.

82.     Defendant Dahn Vo and the other Defendants successfully pitched VBit as an easy way to generate Bitcoin and to become wealthy.

83.     As Bitcoin's value continued to grow between 2018 and 2021, Defendants and VBit's other employees regularly boasted on social media about VBit's purported success.  On July 30, 2021, Mr. Vo posted the following Tweet, stating "Bought 20 [bitcoin] at $29.5k before I left for vacation a week ago," accompanied by a photo of him on a yacht.  "Now a happy camper while I sit on a private yacht."[12]

84.     As reported in a September 7, 2022 Pittsburgh Post-Gazette article, one customer reported seeing VBit employees living the high life with wine and liquor bottles worth thousands of dollars.[13]

85.     In September 2020, VBit posted the following picture of its Vice Chairman, Defendant Gao, wearing a VBit t-shirt and crouching next to a new $150,000 BMW sports car.

---

[11]     Jesse Bunch, *Investors Fear Millions Lost in Pennsylvania's Largest Cryptocurrency Scandal*, PITTSBURGH POST-GAZETTE (Sept. 7, 2022), https://www.postgazette.com/news/ state/2022/09/07/pennsylvania-cryptocurrency-failure-investors-bitcoin-vbitadvanced-mining-group/stories/202209070094.

[12]     Bitcoin Miner US (@BTCminingUS), TWITTER (July 30, 2021, 2:45 AM), https://mobile. twitter.com/BTCminingUS/status/1421044393914650624.

[13]     *See supra*, n.11.

The car had a "VBit1" license plate and VBit captioned the picture "A subtle yet big flex. Congrats to our very own Vice Chairman, Jin Gao, on his new ride! Thank you for your hard work and dedication! We're excited to see what's next!"[14]

86.     In late January 2022, VBit announced that it had purportedly been acquired by a company called Advanced Mining for $105 million.

87.     On January 31, 2022, VBit issued a press release relating to the sale and identified Advanced Mining as "an Asian-based company primarily focused on bitcoin mining."[15]

88.     In the press release, VBit touts "Advanced Mining" as a company that has been "thriving in the crypto mining sector since 2015 and operating 12 data centers dedicated to bitcoin mining in Europe and Asia."[16]

89.     VBit also stated that it was operating 27,000 Antminer S19 series and S17 series out of five data centers "spreading across the globe in the United States, Canada and Kazakhstan."[17]

90.     According to Defendants, on February 17, 2022, alleged Advanced Mining CEO Defendant Lillian Zhao sent an email to all VBit/Advanced Mining customers stating that

---

[14]     Advanced Mining (@miningadvanced), INSTAGRAM (Sept 22, 2020), https://www.instagram.com/p/CFcXDXEBwWm/

[15]     *See* Press Release, VBit Technologies, *VBit Technologies Acquired by Advanced Mining Group in a Huge $105M Deal* (Jan. 31, 2022), https://www.globenewswire.com/en/news-release/2022/01/31/2376030/0/en/VBit-Technologies-Acquired-by-Advanced-Mining-Group-in-a-Huge-105M-Deal.html.

[16]     *Id*.

[17]     *Id*.

Advanced Mining was growing by "acquiring successful crypto mining businesses across the globe."[18]

91.      Her email further stated that, as of February 2022, Advanced Mining operated 12 data centers and expected to operate over 50, which would make it one of the three largest crypto mining companies in the world as measured by hashrate power.

92.      Defendant Zhao also claimed that Advanced Mining would be increasing the interest rate that customers earn by keeping their mined Bitcoin in their Advanced Mining virtual wallets.  She claimed that Advanced Mining customers could earn "14% annual interest on all [Bitcoin] held in the [Advanced Mining] wallet – the highest interest rate paid on [Bitcoin] in the market today!"[19]

93.      Despite the information contained in the press release, Advanced Mining is not – nor has it ever been – registered to do business in any jurisdiction in the United States.  Indeed, for all intents and purposes, Advanced Mining did not exist in any form until January 2022.  If it exists at all, Advanced Mining is a complete sham and the alter ego and/or instrumentality of VBit Tech, VBit Mining, and the Individual Defendants.  If Advanced Mining is in fact a duly authorized legal entity, according to Defendants that entity assumed all obligations of VBit.

94.      According to Defendants, Advanced Mining conducts the same or substantially similar business that VBit conducted before VBit's purported acquisition.

95.      VBit and Advanced Mining have the same or substantially the same ownership. Shortly after the announcement of the Advanced Mining transaction, Defendant Danh Vo posted

_____

[18]      Steve Ranieri, *Is Advanced Mining Group (advancedmining.io Formerly VBit Mining Technologies) a Scam or Legit? My Review of the Hosted Bitcoin Mining Company*, MEDIUM (Apr. 30, 2021), https://snrpro.medium.com/is-vbit-mining-technologies-a-scam-or-legit-my-review-of-the-hosted-bitcoin-mining-company-8ad8a93e889e.

[19]      *Id.*

on LinkedIn that due to his efforts in pushing himself to build VBit, he had neglected his health and therefore would step down as CEO.  Danh Vo's LinkedIn profile states that he is "Retired for now."[20]

96.     On July 12, 2022, VBit entered into a Consent Order with the Securities Division for the State of Washington ("Washington Securities Division"), which concluded that VBit's "offer and/or sale of the combined Bitcoin mining hardware and service packages . . . constitute the offer and/or sale of a security as defined in RCW 21.20.005(14) and (17)"; and "[VBit] has violated RCW 21.20.140, because, as set forth in the Tentative Findings of Fact, it offered and/or sold securities for which no registration is on file with the Securities Administrator."[21]

97.     Pursuant to the Consent Order, VBit agreed to pay fines to the Washington Securities Division totaling $15,000.

98.     VBit also agreed "that for the $156,000 of Bitcoin mining packages sold to approximately 82 Washington residents . . . [VBit] shall refund each Washington resident the original price of their mining package, less the value of any Bitcoin mined using their package (calculated as of the date of entry of this order), in exchange for the mining package purchaser's release of any ownership rights to their mining hardware."[22]

99.     The Consent Order ordered VBit to make the refund payments to Washington purchasers within 120 days of the Order.

---

[20]     Don Vo, LINKEDIN, https://www.linkedin.com/in/danh-vo-vbit-tech/ (last visited Feb. 13, 2023).

[21]     Consent Order at 3, *In re VBit Techs. Inc.*, S-20-3010-21-CO01 (Wash. Dept. of Fin. Inst. July 12, 2022).

[22]     *Id.* at 4.

100.     Despite VBit's claim that it was sold to Advanced Mining in January 2022, the July 2022 Consent Order made no mention of Advanced Mining, and Defendant Lillian Zhou appears on the signature line on behalf of VBit and is identified as its CEO.

101.     Beginning in May 2022, VBit/Advanced Mining customers experienced delays in withdrawing Bitcoin from their virtual wallets.  VBit/Advanced Mining described these delays as "batching" issues or technical glitches.

102.     On or around June 1, 2022, VBit/Advanced Mining stopped processing all withdrawals.

103.     Since approximately June 2022, Plaintiff's virtual wallets have been frozen and Plaintiff cannot withdraw Bitcoin or process any transactions.

104.     Plaintiff's so-called individualized "virtual wallet" is a complete sham, *i.e.*, the wallets are merely numbers contained in a virtual database and not individualized units of Bitcoin associated with each Plaintiff and Class member.

105.     Contrary to their representations, Defendants did not offer or maintain individualized, hardware-hosted mining services to Plaintiff and other customers.  Rather, Defendants either were engaged in cloud mining, or a similar arrangement.

106.     Cloud mining is a form of cryptocurrency mining where participants in a "mining pool" rent a quantity of hashrate power and earn a pro-rata share of any profits based on the amount of hashrate power rented.

107.     It is referred to as cloud mining because, like other cloud-based computing, the equipment that is doing the mining is performed by a shared central server without active management by the user.

108.    Scammers have frequently used cloud mining schemes to dupe customers. Advanced Mining represented that the services it provides are not cloud mining because its customers actually own the hardware.

109.    Plaintiff never received the discrete, individualized mining equipment and services he paid for. Instead, Plaintiff's funds were misappropriated by Defendants, and the Bitcoins appearing in Plaintiff's virtual wallets were in fact other victims' payments arbitrarily designated by Defendants as Plaintiff's generated Bitcoins in order to keep the fraudulent scheme afloat.

110.    On June 27, 2022, Advanced Mining sent an email to its customers stating the following:

> Advanced Mining has positively impacted many lives during its few years in operation. Therefore, it saddens us to inform you that ***we can no longer service the United States market***.
>
> Without over-disclosing, in summary, our team has worked diligently with multiple law firms to ensure that our products and services are not unregistered securities. However, the United States Securities and Exchange Commission (US SEC) disagrees; therefore, Advanced Mining must take measures to abide by US SEC and applicable laws. As a result, we stopped all sales and withdrawals because of a potential pending settlement with the US SEC. During this process, bitcoin mining for clients outside the US may continue normally. After completing our potential pending settlement with the US SEC, we look forward to resuming our global services to clients outside the US and other restricted countries.

111.    The email further states that U.S. customers "who earned more than what they originally paid to VBit/Advanced Mining will keep their earnings and must relinquish ownership of their mining hardware."

112.    The email further explained that "US customers who have not yet earned more than what they originally paid to VBit/Advanced Mining" had two options. They could either: (a) "[k]eep ownership of their hardware and have it shipped to them at their expense" with Advanced Mining refunding any unused prepaid hosting services, or (b) "[r]elinquish their

22

hardware ownership to receive a full refund of all monies paid minus any commissions and mined bitcoins."[23]

113.    Advanced Mining told its customers in the same email that they would be reaching out to customers to capture their choice of the two options.

114.    As of the date of this Complaint, Plaintiff is unable to withdraw Bitcoin from his virtual wallets, despite Defendants' representations that Plaintiff could withdraw at any time all Bitcoin he owned.

### C.    The Mining Contracts Are Unregistered Securities Under *Reves*

115.    VBit and/or Advanced Mining has never been registered in any capacity with the SEC; nor have the Mining Contracts been registered with the SEC or any other state securities agency.

116.    Under §2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1), a "security" is defined to include any "note."

117.    The Supreme Court has noted that "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called."[24]  While not all notes are investments, pursuant to the family resemblance test articulated by the Supreme Court, a note is presumed to be a security and that presumption may be rebutted only by a showing that the note bears a strong resemblance to one of the enumerated categories, such as a "'note delivered in consumer financing'" or the "'note secured by a mortgage on a home.'"[25]  The factors suggesting a note is a security include: (1) investments in a business

---

[23]    *Id.*

[24]    *Reves*, 494 U.S. at 61.

[25]    *Id.* at 65 (citation omitted).

enterprise; (2) the "'common trading'" of the notes offered and sold to a broad segment of the public; (3) the public's reasonable perception from advertisements for the notes that they were investments; and (4) the lack of any risk-reducing factor that would make the application of the Securities Act unnecessary, since the notes were uncollateralized and uninsured and would escape federal regulation entirely if the Securities Act were held not to apply.[26]

118.     These factors underscore that the notes issued by VBit/Advanced Mining and Defendants in the form of Mining Contracts were securities.  First, Plaintiff and the Class invested fiat and/or cryptocurrencies in a business enterprise, namely VBit.

119.     Most significantly, all of the marketing materials promoted by Defendants led Plaintiff and the Class to believe that investing in a Mining Contract with VBit was an investment.

### D.     The Mining Contracts Are Unregistered Securities Under *Howey*

120.     Section 2(a)(1) of the Securities Act also defines a "security" to include any "investment contract."[27]   An investment contract is "an investment of money in a common enterprise with profits to come solely from the efforts of others."[28]   Specifically, a transaction qualifies as an investment contract and, thus, a security if it is: (1) an investment (2) in a common enterprise (3) with a reasonable expectation of profits (4) to be derived from the entrepreneurial or managerial efforts of others.[29]   This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many

---

[26]     *Id.* at 65-66.

[27]     15 U.S.C. §77b(a)(1).

[28]     *Howey*, 328 U.S. at 299.

[29]     *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975).

types of instruments that in our commercial world fall within the ordinary concept of a security.'"[30] Accordingly, in analyzing whether something is a security, "'form should be disregarded for substance,'" and the emphasis should be "on the economic realities underlying a transaction, and not on the name appended thereto."[31]

121.    Plaintiff and the Class's investments in the Mining Contracts meet this definition as they invested money or other valuable consideration, in a common enterprise, VBit/Advanced Mining, with the expectation of profits based upon the efforts of VBit, Advanced Mining, and the Individual Defendants.

122.    Plaintiff and the Class invested fiat, including U.S. dollars, and digital currencies, such as Bitcoin, to purchase the Mining Contracts.

123.    VBit, Advanced Mining, and the Individual Defendants offered and sold the Mining Contracts to the general public.

124.    Each and every purchase of the Mining Contracts by a member of the public is an investment contract.  Stated otherwise, each time a member of the public contracted with VBit, he or she was in actuality purchasing an investment contract.

125.    Additionally, Plaintiff and the Class were passive investors in the Mining Contracts.  Accordingly, the profits of Plaintiff and the members of the Class were intertwined with those of VBit/Advanced Mining and the Individual Defendants.  VBit used proceeds from the Mining Contracts to fund its operations.

---

[30]    *Howey*, 328 U.S. at 299 (citation omitted).

[31]    *Forman*, 421 U.S. at 848-49 (citation omitted).

126.    Investors in the VBit Mining Contracts, including Plaintiff and the Class, made their investments with a reasonable expectation of profits.  In fact, the sole reason for entering into the Mining Contracts was to earn a return on their investment in the form of newly mined Bitcoin.

127.    Investors' profits in the Mining Contracts were to be derived from the managerial efforts of others, specifically VBit, Advanced Mining, and the Individual Defendants.  Investors relied on the technical, managerial, and entrepreneurial efforts of the Defendants to manage, oversee, and/or develop the Bitcoin mining facilities funded by sale of the Mining Contracts

128.    Defendants held themselves out to investors as experts in the Bitcoin mining industry.

129.    As executives of VBit and Advanced Mining, the Individual Defendants ran VBit's day-to-day operations and were responsible for all aspects of company products and strategy and for the growth of and investment in VBit.

## CLASS ACTION ALLEGATIONS

130.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class of persons:

> All persons or entities who purchased unregistered securities in the form of VBit Mining Contracts and were subsequently damaged thereby.  Excluded from the Class are: corporate officers, members of the boards of directors, and senior executives of Defendants; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

131.    The Class Period is defined as January 1, 2019, through the date of this filing, inclusive.[32]

---

[32]    Plaintiff reserves the right to expand or amend the Class Definition or Period based on discovery produced in this matter.

132.    The members of the Class are so numerous that joinder of all members is impracticable.  Plaintiff believes there are at least 15,000 Class members.  The exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery.

133.    The Class is readily ascertainable and identifiable.  They can be identified by reference to Defendants' own records and databases.  Moreover, Class members will be able to come forward and identify themselves.

134.    Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff's claims are typical and representative of the claims of all members of the Class.  Plaintiff suffered injury in fact as a result of their investments in VBit Mining Contracts.

135.    Plaintiff's claims are typical of the claims of all Class members, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws.  All members of the Class have sustained injury in fact as a result of VBit's inability to pay the amounts due to them in their customer accounts.

136.    There are no unique defenses that may be asserted against Plaintiff individually, as distinguished from the other members of the Class, and the relief sought is common to the Class.  Plaintiff is typical of other members of the Class, does not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and has no conflict with any other members of the Class.

137.    Plaintiff has retained competent counsel experienced in securities, cryptocurrency, and class action litigation to represent himself and the Class.

138.    Questions of law and fact common to the Class that predominate over any questions that may affect only individual members of the Class, include, but are not limited to:

a.      Whether the VBit Mining Contracts are securities under the Securities Act;

b.      Whether Defendants' offerings and sales of VBit Mining Contracts violated the registration provisions of the Securities Act;

c.      Whether Defendants made materially false and misleading statements and omissions in connection with the VBit Mining Contracts;

d.      Whether Defendants made the materially false statements and omissions with scienter;

e.      Whether the Individual Defendants are control people of the Company Defendants; and

f.      The type and measure of damages suffered by Plaintiff and the Class.

139.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to redress individually the wrongs done to them.  In the absence of a class action, Defendants will retain the benefits of their wrongful conduct.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities in Violation of**
**§§5 and 12(a)(1) of the Securities Act**
**(Against All Defendants)**

140.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint.

141.    Defendants, and each of them, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

142.    VBit Mining Contracts are securities within the meaning of §2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

143.    Plaintiff and members of the Class purchased VBit Mining Contract securities from Defendants.

144.    No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

145.    By reason of the foregoing, each of the Defendants has violated §§5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a).

146.    As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff and members of the Class have suffered damages in connection with their respective purchases of VBit Mining Contract securities.

## SECOND CLAIM FOR RELIEF

### Violation of §15 of the Securities Act
### (Against All Defendants)

147.    Plaintiff, on behalf of himself and all others similarly situated, reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint.

148.    This Count is asserted against Defendants under §15 of the Securities Act, 15 U.S.C. §77o.

149.     Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of §15 of the Securities Act.  Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of VBit Mining Contract securities as described herein.

150.     Defendants, separately or together, possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of VBit and Advanced Mining, through ownership of voting securities, by contract, subscription agreement, or otherwise.

151.     Defendants, separately or together, had sufficient influence to have caused VBit and/or Advanced Mining to submit a registration statement.

152.     Defendants, separately or together, jointly participated in, and/or aided and abetted, VBit's failure to register the Mining Contracts.

153.     Defendants knew of or had reasonable grounds to believe in the existence of the facts underlying Defendants and VBit/Advanced Mining's liability for violating §12(a) of the Securities Act, 15 U.S.C. §77l(a).

154.     By virtue of the conduct alleged herein, the Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

## **THIRD CLAIM FOR RELIEF**

### **Violation of §10(b) of the Exchange Act and Rule 10b-5**
### **(Against All Defendants)**

155.     Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

156.    This Count is asserted against Defendants and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

157.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.   Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of VBit Mining Contract securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire VBit Mining Contract securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

158.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the VBit Mining Contracts, marketing materials, websites, press releases, and other statements and documents, as described above, including statements made to securities analysts and the media, that were designed to influence the demand for VBit Mining Contracts.   Such content, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about VBit/Advanced Mining's business and operations.

159.     By virtue of their positions at VBit/Advanced Mining, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted, as described above.

160.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As senior managers and/or officers of VBit/Advanced Mining, the Individual Defendants had knowledge of the details of VBit/Advanced Mining's internal affairs.

161.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to, and did, directly or indirectly, control the content of the statements of VBit/Advanced Mining.  As a result of the dissemination of the aforementioned false and misleading VBit Mining Contracts, website content, releases, and public statements, the cost of the VBit Mining Contracts was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning VBit/Advanced Mining's true business and financial condition, which were concealed by Defendants, Plaintiff and other members of the Class purchased or otherwise acquired VBit Mining Contract securities at artificially inflated prices and relied upon the efforts and statements disseminated by Defendants, and were damaged thereby.

162.    Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said VBit Mining Contract securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of the unregistered VBit Mining Contract securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.

163.    By reason of the conduct alleged herein, Defendants have knowingly or recklessly, directly or indirectly, violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

164.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of VBit's securities during the Class Period, upon the disclosure that VBit had been misrepresenting their business to the investing public.

## FOURTH CLAIM FOR RELIEF

**Unjust Enrichment/Restitution**
**(Common Law, in the Alternative)**
**(Against All Defendants)**

165.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint.

166.    Plaintiff and members of the Class conferred a monetary benefit on Defendants by investing fiat money and cryptocurrency in connection with the VBit Mining Contracts, which allowed Defendants to inappropriately pay out proceeds to other investors.

167.    Defendants received a financial benefit from the sale of their VBit Mining Contracts at inflated prices and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belongs to Plaintiff and members of the Class.

168.    Plaintiff seeks restitution in the form of the monetary value of the difference between the purchase price of the VBit Mining Contracts and any proceeds Plaintiff received from the purported Bitcoin mining.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on his behalf and that of the Class as follows:

A.    Declaring that this action may be maintained as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as representatives of the Class, and designating his counsel Scott+Scott Attorneys at Law LLP as Lead Counsel for the Class and Christensen & Dougherty LLP as Liaison Counsel for the Class;

B.    Declaring that the VBit Mining Contracts are securities and that Defendants' unregistered sales of the VBit Mining Contracts violated applicable laws;

C.    Awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

D.    Awarding such injunctive or other equitable relief as the Court may deem just and proper; and

E.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Dated:  February 13, 2023                 Respectfully submitted,

**CHRISTENSEN & DOUGHERTY LLP**

s/ *Joseph L. Christensen*

Joseph L. Christensen (#5146)
1000 N. West St., Suite 1200
Wilmington, DE 19801
Telephone: 302-212-4330
joe@christensendougherty.com

OF COUNSEL:

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (*pro hac vice* forthcoming)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
jjasnoch@scott-scott.com

*Attorneys for Plaintiff*

## **CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS**

I, Parker Pelham, hereby certify that the following is true and correct to the best of my knowledge information and belief:

1.      I have reviewed the complaint in this action and authorize Scott+Scott Attorneys at Law to file it on my behalf.

2.      I am willing to serve as a representative party on behalf of all persons and entities that purchased, or otherwise acquired, VBIT and Advanced Mining-related unregistered securities.

3.      During the relevant period, I purchased and/or sold the security that is the subject of the complaint, as set forth in the attached **Schedule A.**

4.      I did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

5.      During the three-year period preceding the date of my signing this Certification, I have not sought to serve, or served, as a representative party or lead plaintiff on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond the *pro rata* share of any recovery, expert for such reasonable costs and expenses (including lost wages) directly related to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   22   January, 2023 at   Wilmington, NC   (city, state).


_Parker Pelham_                              01/22/2023
Parker Pelham

**SCHEDULE A**

VBIT and Advanced Mining-Related Unregistered Securities Transactions

| Date | Transaction | Detail | Number | Price | Total |
|------|-------------|--------|--------|-------|-------|
| 1/2/2020 | BUY | Gold Hosting Package | 1 | $2,550 | $2,550 |
| 5/2/2020 | BUY | Computer Server Hosting Order | 6 | $35.00 | $210.00 |
| 7/18/2020 | BUY | Black Diamond Hosting Package | 1 | $50,000 | $50,000 |
| 9/14/2020 | BUY | Gold Hosting Package | 1 | $2,550 | $2,550 |
| 12/2/2020 | BUY | Initial Affiliate Payment January 2021 to June 2021 | 1 | $149 | $149 |
| 12/9/2020 | BUY | Special Hosting Service Renewal | 1 | $18,860 | $18,860 |
| 5/19/2021 | BUY | Affiliate Payment 1 year June 2021 to June 2022 | 1 | $123.48 | $123.48 |
| 12/27/2021 | BUY | Black Diamond Package | 1 | $139,699 | $139,699 |
| 6/6/2022 | BUY | Affiliate Membership Payment | 1 | $110.07 | $110.07 |
| 6/13/2022 | BUY | Gold Package Hosting Renewal | 1 | $577 | $577 |